# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| THE DEMOCRATIC PARTY OF GEORGIA, INC., <br><br>        PLAINTIFF, <br><br> V. <br><br> ROBYN A. CRITTENDEN, in her official capacity as interim SECRETARY OF STATE OF THE STATE OF GEORGIA, <br><br>        DEFENDANTS. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **EMERGENCY RELIEF REQUESTED** <br><br> Civ. Act. No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).  "No right is more precious in a free country than that of having a voice in the election of those who make the laws … Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  The right to vote includes "the right of qualified voters within a state to cast their

ballots **and have them counted**." *United States v. Classic*, 313 U.S. 299, 315 (1941) (emphasis added).

2.      Accordingly, Plaintiff Democratic Party of Georgia ("DPG") files this Complaint for injunctive relief under 42 U.S.C. § 1983 against Defendant Robyn A. Crittenden, in her official capacity as Secretary of State for the State of Georgia ("Crittenden") to secure declaratory and injunctive relief for the unlawful deprivation of DPG's constitutes' and members' constitutional rights guaranteed by the First and Fourteenth Amendments to the United States Constitution, and to redress harm to its organizational interests wrought through the implementation of Georgia's election code by the counties under Crittenden's supervision.

3.      The ability of Georgians to freely and fairly exercise the franchise in 2018 elections has been a matter of some dispute, as the numerous lawsuits concerning election administration in Georgia's 2018 elections have shown.[1] Concern for the ability of voters to vote via absentee mail-in ballot has bene particularly scrutinized. That concern now extends to the runoff elections for

---

[1] *See, e.g., Curling v. Crittenden*, No. 1:17-CV-2989-AT (N.D. Ga.); *Ga. Coal. for People's Agenda v. Crittenden*, No. 1:18-CV-04727-ELR (N.D. Ga.); *Martin v. Crittenden*, No. 1:18-CV-4776-LMM (N.D. Ga.); *Ga. Muslim Voter Project v. Crittenden*, No. 1:18-cv-4789-LMM (N.D. Ga.); *Common Cause Ga. v. Crittenden*, No. 1:18-cv-5102-AT (N.D. Ga.); *Democratic Party of Ga. v. Burkes*, No. 1:18-CV-00212 (M.D. Ga.); *Democratic Party of Ga. v. Crittenden*, No. 1:18-CV-05181-SCJ (N.D. Ga); *Kwon v. Crittenden,* No. 1:18-cv-5405-TCB (N.D. Ga.).

statewide elected offices of Secretary of State and Post _ of the Public Service Commission, for which the polls are scheduled to close at 7:00 p.m. on December 4, 2018 (the "Runoff Election").

4.     Despite continuing interest in the outcome of the elections for these statewide offices, county election superintendents have failed to adhere to their statutory duties to send out absentee ballots to eligible applicants "as soon as possible" after certification of the results. Some counties began sending ballots on the first business day after statewide results were certified – but others waited until as late as November 27 – just one week before the deadline for counties to receive absentee mail-in ballots that will be counted – just to mail ballots to eligible applicants.

5.     This has and will result in arbitrary and disparate treatment of voters who seek to exercise their respective rights to vote via absentee mail-in ballot, based solely on their county of permanent residence. If the county began sending absentee ballots early enough, the voter will have the opportunity to send back a completed ballot in time for the county registrar to receive the ballot prior to the closing of the polls. If the voter's county waited several days after the runoff absentee ballots were available to mail the ballots, however, the voter will not have the chance to return the ballot prior to the closing of the polls.

6.     The variance in mailing dates also will work a severe and undue burden on voters who cannot vote in person, whether in advance or on Election Day, who happen to have their ballots mailed to them so late that they cannot return a cast ballot in time for it to be counted, through no fault of their own.

7.     There is no reason it needs to be this way.  A simple solution exists: the Court can issue an injunction requiring Secretary of State Crittenden to order the Counties to treat absentee mail-in ballots like those sent by military voters and overseas voters, counting ballots postmarked by Election Day and received by the voter's county within three days following the election. This relief is necessary, fitting, and proper to protect Georgians' right to vote.

8.     Moreover, no delay or legitimate burden on state or regulatory interests will result from granting this relief. Counties are not required by statute to certify Runoff Election results until December 10, 2018, while he Secretary of State is not required to certify the statewide results until December 18, 2018. Moreover, election superintendents and county registrars will remain engaged not only in receiving, examining, and counting military and overseas ballots in the three days following Election Day, but also in examining provisional ballots and receiving and examining curative information submitted by provisional voters.

9. DPG seeks equitable relief in the form of an order and judgment enjoining the rejection of otherwise proper absentee mail-in ballots that are postmarked by Election Day, December 4, 2018, and received by December 7, 2018, and enjoining Secretary Crittenden from certifying statewide election totals without first confirming that Georgia's 159 counties have not rejected these absentee mail-in ballots.

## PARTIES, JURISDICTION, AND VENUE

10. This Court has jurisdiction of this action a) pursuant to 28 U.S.C. §§ 1343(a) and 42 U.S.C. § 1983 and 1988 because it seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the First and Fourteenth Amendments to the U.S. Constitution, and b) pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States.

11. This Court has jurisdiction to grant both declaratory and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district and division.

13.     Plaintiff Democratic Party of Georgia ("DPG") is a state committee, as defined by 52 U.S.C. § 30101(15), and the official Democratic Party organization of the state of Georgia.

14.     DPG represents a diverse group of stakeholders, including elected officials, candidates for elected offices (including candidates standing for office in the Runoff Election), state committee members, advisory caucuses, affiliate groups, grassroots activists, and active voters.  DPG works to increase turnout to elect Democratic candidates across Georgia and assists Georgians to ensure that all eligible voters have access to the franchise.[2]

15.     DPG has direct organizational standing to bring claims for violations of the Georgia election code and of the U.S. Constitution.

16.     In particular, DPG devoted extraordinary resources during the 2018 general election and Runoff Election cycles to encouraging all voters to consider voting by absentee mail-in ballot. The rejection of absentee mail-in ballots cast by voters who received them in the mail too late to return prior to the closing of the polls frustrates DPG's organizational mission by decreasing turnout and by resulting in fewer votes for Democratic candidates. Porter Decl.

---

[2] *See* Declaration of Dubose Porter, attached as Exhibit 1 to Complaint.

17.    Further, the rejection of absentee ballots, and the failure of Crittenden to require Georgia counties to comply with Georgia law in the mailing of absentee ballots for the Runoff Election has caused, is causing, and will in the future cause a diversion of DPG financial and personnel resources. DPG spent substantial time, money, and energy in advance of the election attempting to cure absentee ballot processes, policies, and procedures. Porter Decl.

18.    For example, DPG spent significant time and resources educating its staffers, volunteers, and candidates' campaigns, as well as registered voters, about the order of this Court compelling Crittenden to confirm that each county's election returns include the counts for absentee mail-in ballots that had been rejected due to the voter's omission or incorrect completion of her birth date in the required oath. Porter Decl.; *see also DPG v. Crittenden,* __ F. Supp. 3d __, No. 1:18-cv-5181-SCJ, 2018 WL 5986537, at *10, 15 (N.D. Ga. Nov. 14, 2018).

19.    DPG is receiving calls into its Voter Protection Hotline from aggrieved absentee voters requesting DPG's assistance in obtaining and returning absentee ballots for which they applied as soon as possible, yet which data obtained from the Secretary of State's office show were not mailed until just before Election Day. Handling those calls diverts DPG employees and volunteers away from assisting other voters in the State of Georgia. Porter Decl.

20.     DPG expects to continue to devote organizational resources to the problem in the future. DPG has numerous competing priorities for its limited resources, and the failure of several counties to mail absentee ballots in accordance with Georgia law has required DPG to divert resources that would otherwise have been used on other, time-sensitive priorities. Porter Decl.

21.     For example, DPG must pull its volunteers and employees from assisting Democratic candidates for Secretary of State and Public Service Commissioner so that they can provide emergency assistance to Georgia voters. Ensuring that absentee ballots cast and mailed by Election Day would be counted as cast would allow Plaintiffs to more effectively and efficiently manage their respective resources without burdening their organizational missions and objectives. Porter Decl.

22.     DPG also has representational standing based on injuries to its members. DPG's members include both current elected officials and current candidates for office. Those candidates are injured if fewer absentee ballots are counted. DPG's membership also includes the affected electorate itself, who have unquestionably been injured by having their ballots outright rejected, by having an undue burden placed on their voting rights, and by the uncertainty of not knowing

whether absentee ballots received at the end or after the close of absentee in-person voting would in fact be accepted and counted as cast.  Porter Decl.

23.     Defendant Robyn A. Crittenden is Georgia's Secretary of State and is named solely in her official capacity as such. Crittenden is Georgia's chief election official. In that capacity, she is responsible for promoting and supporting accurate, fair, open and secure elections for the citizens of Georgia, for implementing election laws and regulations, and for issuing election bulletins and instructions to election superintendents and registrars throughout Georgia's 159 counties. She also is responsible for tabulating the consolidated returns of the counties of Georgia, for directing county election superintendents to conduct recounts when required under Georgia law, and for certifying the vote total for statewide elected offices. *See* Ga. Code Ann. §§ 21-2-50(b), 495, 499; Ga. Comp. R. & Regs. 590-1-1-.01, .02; *see also DPG v. Crittenden,* Order at 23-27, 43.

24.     Crittenden was appointed Georgia's Secretary of State on Thursday, November 8, 2018, replacing Brian P. Kemp, who resigned his office after overseeing the election culminating on November 6, 2018, in which he ran as a candidate for Georgia's governor.

## FACTS

A. <u>Georgia's Absentee Ballot Process</u>

25.    Georgia permits "no excuse" absentee balloting, meaning that any registered Georgia voter can vote absentee by mail without being required to provide a reason for voting by absentee ballot. O.C.G.A. § 21-2-380(b); *Spalding Cty. Bd. Of Elections v. McCord*, 287 Ga. 835, 840 (2010).

26.    Any absentee voter, or in certain circumstances a close relative of the absentee voter, may submit an application for the voter to vote absentee by mail to the Board of Registrars or Absentee Ballot Clerk for the voter's County (collectively, "Registrar") within 180 days of a primary or general election, or a runoff of either. O.C.G.A. § 21-2-381(a)(1)(A). The voter should, among other identifying and required information, identify the election in which she seeks to vote absentee. O.C.G.A. § 21-2-381(a)(1)(C). Upon receipt of a timely application for an absentee ballot, the Registrar shall enter the date received, determine whether the applicant is eligible to vote in the election involved, and, if the voter is found eligible, shall mail the absentee ballot for the election requested. O.C.G.A. § 21-2-381(b)(1), (b)(2)(A).

27.    Voters of advanced age, disabled voters, military voters, and overseas voters may elect to submit a single "rollover" application, requesting an absentee

ballot for all primary, general, and runoff elections in a given year. O.C.G.A. §§ 21-2-381(a)(1)(G), 381.2.

28.     To ensure that voters have adequate time to exercise their right to vote by absentee ballot in a runoff election, the Board of Registrars or Absentee Ballot Clerk (collectively, "Registrar") for a County "**shall** mail or issue official absentee ballots to all eligible applicants … **as soon as possible** prior to any runoff." O.C.G.A. § 21-2-384(a)(2) (emphasis added).

29.     Generally, an absentee ballot must be returned to the Board or Clerk prior to the closing of the polls on the date of the election. When an absentee ballot is received after the closing of the polls, the Registrar "shall promptly notify the elector by first-class mail that the elector's ballot was returned too late to be counted and that the elector will not receive credit for voting in the primary election." O.C.G.A. § 21-2-386(a)(F).

30.     However, not all absentee ballots must be received prior to the closing of the polls. Overseas and military ballots "that are postmarked by the date of such primary, election, or runoff and are received within the three-day period following such primary, election, or runoff, if proper in all other respects, shall be valid ballots and shall be counted and included in the certified election results." O.C.G.A. § 21-2-386(a)(G).

B.  Certification of the November 6, 2018 General Election

31.    Georgia law required Secretary of State Crittenden to tabulate and
certify the statewide election results within 14 days of the close of the polls of the
November 6, 2018 general election, or by November 20, 2018. O.C.G.A. § 21-2-
499.

32.    While counties ordinarily are required to certify their election results by
the Monday following the general election day, this Court enjoined their
certification of their results until after 5:00 p.m. on Friday, November 16.  *Common
Cause Georgia v. Kemp*, __ F. Supp. 3d __, No. 1:18-cv-5102-AT, 2018 WL
5915657, at *21 (N.D. Ga., Nov. 12, 2018).

33.    Secretary of State Crittenden ultimately certified the statewide General
Election results on Saturday, November 17, 2018.

34.    Crittenden's certification permitted the Secretary of State's office to
finalize and disseminate to the counties the Runoff Election ballot to be used in
absentee and Election Day voting for the Runoff Election.

35.    There are only two statewide offices on the ballot, both of which had
two candidates that accumulated significantly more votes than the third-place
candidate in the General Election. On information and belief, these Runoff Election

ballots were available to counties to print and mail by the morning of Monday,

November 19.

C.  Counties Begin Mailing Absentee Ballots at Different Times Despite
    Knowledge of When Ballots Would Become Available

36.     On information and belief, many county election superintendents and

Registrars have exerted considerable effort throughout the General Election,

including working on evenings and weekends.

37.     Some counties began mailing Runoff Election absentee ballots on

Monday, November 19, to eligible applicants. According to data available from the

Secretary of State, at least five counties appeared to begin issuing ballots that day –

Cherokee, Clayton, Cobb, Floyd, and Henry. Several other counties mailed ballots

starting on November 20 or November 21.[3]

38.     Even so, many counties waited more than a week after ballots became

available to mail absentee ballots to a known universe of eligible applicants

seeking to vote by mail.

39.     According to data available from the Secretary of State, 44 counties

did not mail their first absentee ballot for the Runoff Election until November 26 –

---

[3] *See* Declaration of Andrea Young, attached as Exhibit 2 to Complaint.

a full week after the absentee ballot was authorized and disseminated by the

Secretary of State's office.[4]

40.    Another 21 counties did not mail their first absentee ballot until

November 27.[5]

41.    Mail is not delivered quickly in many parts of the State of Georgia.

For example, in 2012, the United States Postal Service closed hundreds of mail

distribution centers across the county as a cost-savings measure, including eight in

Georgia. One closed center was in Albany, resulting in its mail being routed

through a distribution center in Tallahassee, Florida. Another was in Savannah,

resulting in Savannah mail being routed through a distribution center in

Jacksonville, Florida. Still another was in Augusta, resulting in some of its mail

being routed through Macon and some of it through Greenville, South Carolina.

42.    As a result, it typically takes three to four days from when the county

lists an absentee ballot as sent for it to reach the voter, and as many days for the

ballot to be returned to the Registrar. The result is that the process of casting a

ballot in many parts of Georgia is slow, losing days on both the delivery and the

---

[4] *Id.*

[5] *Id.*

return trip, even without accounting for how far across the country a ballot may need to travel.

43.     The demand for absentee mail-in ballots was known and apparent well in advance of statewide certification.  In the General Election alone, 283,839 voters attempted to vote absentee by mail.  For the Runoff Election, at least 121,301 voters have submitted an application for absentee mail-in ballot.[6]

44.     Litigation concerning voters' problems exercising their right to vote also involved boards of registration and elections in Dougherty, DeKalb, Gwinnett, and other counties, in addition to Secretary Crittenden's office. *See* footnote 1 *supra* (collecting cases filed concerning exercise of voting rights and suppression thereof in October and November 2018).

D.  Late Mailing Of Absentee Ballots Places A Substantial Burden On Voting

45.     The result of the unexplained delay in sending of absentee ballots to eligible applicants by many counties across Georgia is that electors residing in those counties who sought to vote in the Runoff Election by absentee ballot are significantly burdened in exercising their franchise, and at imminent risk of being denied the right to vote at all.

---

[6] *Id.*

46.     Voters should have received their ballots "as soon as possible prior to" the Runoff Election, but some or many of these ballots have only just issued, even where the voter applied for a ballot well in advance.

47.     Although voters who request an absentee ballot sometimes still have the option of voting in person, that process is not always practical or even possible, such as where the voter has work or childcare obligations, is disabled, or is not physically present in their county of residence on the day of the election (thus necessitating an attempt to vote absentee). Georgia voters rely on their right to receive absentee ballots "as soon as possible" after certification and in advance of a runoff to plan their schedules and ensure that they will be able to cast a timely ballot.

48.     In addition, voters who have requested an absentee ballot but attempt to vote in person are subject to an additional layer of administrative hurdles, such as the requirement that they appear in person before and submit a written cancellation request to the Registrar. *See* O.C.G.A. § 21-2-388(2).

49.     In addition, a voter who is unaware of the slower mail transit speed in several parts of Georgia may mistakenly believe that a ballot postmarked shortly before the election would reach the Registrar in time, when it may not.

50.     This is not a hypothetical situation. One Georgia voter registered in DeKalb County is currently residing temporarily in Montana. The voter traveled from Montana to Georgia in early November to cast his ballot in person for the General Election.

51.     Because he does not have time or financial resources to return for the Runoff Election, his mother applied for an absentee ballot on November 14. DeKalb County responded that same day via email that the request had been received and would be held until ballots were "ready to go out."

52.     Even so, DeKalb County did not mail his ballot until November 27, thirteen days after his request was received.

53.     There are 28 days between the close of the polls in the General Election, November 6, and in the Runoff Election, December 4.

54.     Given the late date of ballot mailing, the distance from DeKalb County, Georgia to Montana, and reasonably anticipated mail delays resulting from transit slowdowns and high mail volume during the holiday shopping season, this voter is deeply concerned that he will not receive his ballot in time to vote and return it by 7:00 p.m. on December 4 so his votes are counted, even if he were to pay for overnight shipping.

55.     Another DeKalb County voter is eligible for a "rollover" absentee ballot and voted an absentee mail-in ballot in the General Election.

56.     Even though she did not need to submit a new absentee ballot application to receive a Runoff Election absentee mail-in ballot, her ballot was not mailed by the DeKalb County registrar until November 24, 2018, and she had not received it as of November 28.

57.     This voter would need physical assistance and transportation to vote in person, whether during the advance voting period or on Election Day. She is deeply concerned that if she receives her absentee mail-in ballot that it will not reach the DeKalb County Registrar by 7:00 p.m. on December 4, and that her votes will not count as a result.

58.     Another voter residing in Chatham County eligible for a "rollover" absentee ballot, who is physically disabled and cannot vote in person, still has not received her absentee mail-in ballot.

59.     This voter subscribes to a service from the U.S. Postal Service that sends her scans of her mail, through which she can see that her ballot was postmarked November 27.  Publicly available data records her ballot as having been "issued" on November 23.

60.    This voter cannot afford to pay for overnight shipping to ensure the ballot reaches the Chatham County Registrars if and when her ballot arrives. She is deeply concerned that she will not receive her ballot in time to ensure her ballot is returned to the Registrar by 7:00 p.m. on December 4, so that it will count.

61.    Courts have consistently held that once absentee voting is provided to voters, the State cannot deprive citizens of due process with regard to the use of absentee voting to cast a vote that counts. *Martin v. Crittenden,* No. 1:18-cv-04776-LMM (N.D. Ga. Oct. 30, 2018), Order (Dkt. No. 38) at 4-5 (denying motion to stay preliminary injunction and noting that "creat[ing] a statutory scheme entitling qualified persons to cast absentee ballots, thereby confer[s] a statutory entitlement deserving of due process protections"); *Raetzel v. Parks/Bellemont Absentee Election Bd.,* 762 F. Supp. 1354, 1358 (D. Ariz. 1990) ("[w]hile it is true that absentee voting is a privilege and a convenience to voters, this does not grant the state the latitude to deprive citizens of due process with respect to the exercise of this privilege")*; see also Zessar v. Helander,* No. 05 C 1917, 2006 WL 642646, at *6 (N.D. Ill. 2006) ("approved absentee voters are entitled to due process protection.").

E.  <u>No State Interest Justifies This Burden</u>

62.     While allowing absentee mail-in ballots postmarked by Election Day, and received within the three-day period thereafter, to count is critical to ensure voters are not disenfranchised, there is no countervailing state interest in prohibiting the receipt of these ballots.

63.     There is no conflict between protecting voters' rights and counting absentee mail-in ballots cast before the close of the polls but received in the three days following Election Day. As stated above, counties need only certify their election results to Secretary of State Crittenden by the Monday following the election, December 10, 2018, at 5 p.m. O.C.G.A. § 21-2-493.

64.     The Secretary of State in turn must certify the election results by Tuesday, December 18, 2018. O.C.G.A. § 21-2-499.

65.     Further, the Georgia Election Code already requires counties to have publicly commenced the computation and canvassing of returns at noon on the day following the election, and thus contemplates that this canvassing would occur while absentee ballots are being received and examined within the statutory three-day timeframe.  This canvassing is occurring also as military and overseas ballots are still being received; such votes may be received up to three days after election day.  O.C.G.A. § 21-2-386(a)(G).

66.     Finally, the counties remain under a restraining order not to reject some provisional ballots before the certification deadline.  *See Martin v. Crittenden*, No. 1:18-CV-4776-LMM, 2018 WL 5917860, at *4 (N.D. Ga. Nov. 13, 2018); *see also* Official Election Bulletin (Nov. 21, 2018), attached as Exhibit 3.

67.     In this case, the Court concluded that plaintiffs had shown a substantial likelihood of success that counties' procedures for verifying signatures on absentee ballots violated voters' procedural due process rights.  On that basis, the Court issued a temporary restraining order that, among other things, required Registrars to treat absentee ballots with purported signature mismatches as provisional ballots and then to provide affected voters with notice and an opportunity to cure.

68.     Importantly, the Court's order specifically permits this process to continue up until the certification of the consolidated returns of the election by the election superintendent.  *Id.* at 2.  The order makes clear, however, that appeals not resolved by 5 p.m. on the certification deadline shall not delay certification unless those votes would change the outcome of the election.  *Id*.  The result is that the relief requested in this Complaint would not delay any aspect of the certification process for the final statewide returns of the Runoff Election.

69.     There thus are no legitimate interests of sufficient weight in counting only absentee mail-in ballots that county Registrars receive by December 4 when counties continue to receive military and overseas absentee mail-in ballots that will count if otherwise proper through December 7, and when counties do not currently have to certify their election results until December 10.

## CAUSES OF ACTION

## Count I –Violation Of The Fundamental Right To Vote Under The First And Fourteenth Amendments

70.     Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if fully set forth herein.

71.     Under the First Amendment and the Fourteenth Amendment, any state election regulation that imposes non-discriminatory restrictions on the right to vote must be justified by an important regulatory interest. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). "Although the United States Constitution, and Supreme Court decisions interpreting the Constitution, give primary responsibility for administering and regulating elections to the States, the States must adhere to certain constitutional and statutory requirements." *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004). "However slight th[e] burden may appear … it must be justified by relevant and legitimate state interests sufficiently weighty to justify

the limitation." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1352 (11th Cir.

2009) (quoting *Crawford v. Marion County Election Board*, 553 U.S. 181, 128 S.

Ct. 1610, 170 L.Ed.2d 574 (2008) (Stevens, J., plurality opinion)).

72.    The government cannot infringe upon the right to vote without

adequate justification, and the greater the magnitude of the infringement, the

stronger the justification must be. A Court must "weigh 'the character and

magnitude of the asserted injury to the rights protected by the First and Fourteenth

Amendments that the plaintiff seeks to vindicate' against 'the precise interests put

forward by the State as justification for the burdens imposed by its rule,' taking

into consideration 'the extent to which those interests make it necessary to burden

the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at

789).

73.    Defendant Crittenden has the duty to ensure the integrity of the

Runoff Election, including compliance with O.C.G.A. § 21-2-384(a)(2) requiring

the Registrar "to mail or issue official absentee ballots to all eligible applicants …

as soon as possible prior to any runoff," including the Runoff Election.

74.    Acting under color of state law, Crittenden has deprived DPG of

rights secured by the U.S. Constitution, namely, the fundamental right to vote.

75.     Affected absentee mail-in voters have no opportunity to cast a ballot that will count.

76.     The burden imposed on absentee mail-in voters without an opportunity to remedy cast a ballot that will count is severe.

77.     As set forth above, enforcing the requirement that ballots be received prior to the close of polls where a county has failed in its obligation to mail absentee ballots sufficiently in advance of an election would impose significant burdens on the fundamental right to vote. Indeed, the decision by the General Assembly of Georgia to dictate by statute that ballots be delivered sufficiently in advance of the election demonstrates that Georgia considers voters to have a compelling interest in having adequate time to review, complete, and return their ballots.

78.     Where a voter receives a ballot too late to return it in time to vote, it is obvious that the voter experiences a burden of the denial of the right to vote.

79.     Defendants have no precise interest of sufficient weight that justifies the burdens imposed by county rejection of absentee mail-in ballots arriving after the polls close, solely due to counties mailing the ballots too late.  Neither Crittenden nor the counties have a regulatory interest in enforcing Georgia law

requiring the rejection of absentee mail-in ballots under the circumstances presented here.

80.     Although Crittenden may assert a governmental interest in convenience, finality, or simplicity in rejecting absentee ballots not received before the close of polls, this interest in minimal.

81.     Georgia already permits some absentee ballots to be postmarked the day of the election and received up to three days later, namely, overseas and military voters. Further, Crittenden and Georgia counties already have processes in place to count such votes, and cannot complete their canvas prior to doing so. *See* O.C.G.A. § 21-2-386(a)(G). Crittenden and Georgia counties also have processes in place during the three days after Election Day to examine and allow for voters' curing of provisional ballots. *See* O.C.G.A. § 21-2-419.

82.     Counties need not certify their results until Monday, December 10, after the three-day period envisioned for military and overseas voters. Similarly, the Secretary of State's office need not certify statewide election results until Tuesday, December 18.

83.     The result is that providing the relief requested in this complaint will engender no delays in certifying the result and not require the Defendants to develop any additional processes. Thus, the state has no interest of sufficient

importance to outweigh the undue burden that application of O.C.G.A. § 21-2-386(a)(F) would place on eligible voters.

## Count II – Violation of the Due Process Clause of the Fourteenth Amendment

84.     Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if fully set forth herein.

85.     Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person of … liberty … without due process of law." This due process principle protects the fundamental right to vote.

86.     A claim for procedural due process lies when there is a constitutionally protected liberty or property interest and a governmental failure to provide an appropriate level of process.

87.     Crittenden's administration of Georgia's absentee ballot program, in declining to ensure Georgia counties comply with Georgia law requiring the mailing of absentee ballots "as soon as possible," has resulted and in the absence of relief will result in absentee mail-in ballots being rejected without providing the elector any form of process to remedy the immaterial flaw.

88.     DPG and its constituents and members possess a constitutionally protected right to vote, and the process by which Crittenden and the counties have

implemented the absentee ballot process has or will result in some ballots being rejected through no fault of the elector and without providing the elector any form of process to remedy that rejection.

89.     As a result of the rejection of absentee mail-in ballots without providing voters with meaningful notice and an opportunity to cure, it would be improper, unfair, and contrary to the Fourteenth Amendment's guarantee of due process of law for counties to reject absentee ballots, or Crittenden to certify election results based on the rejection of absentee ballots, because they were received after the closure of the polls.

90.     In the absence of technical and legal direction from Defendant Crittenden, it would be improper, unfair, and contrary to the Fourteenth Amendment's guarantee of due process of law for any county registrar to continue to reject absentee ballots because they were received after the closure of the polls.

### Count III – Violation of the Equal Protection Clause of the Fourteenth Amendment

91.     Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if fully set forth herein.

92.     Under the Equal Protection Clause of the Fourteenth Amendment, "citizens enjoy 'a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction.'" *Citizen Center v. Gessler*, 770

F.3d 900, 918 (10th Cir. 2014) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336

(1972)). Thus, "state actions in election processes must not result in 'arbitrary and

disparate treatment'" of voters. *Hunter v. Hamilton Cnty. Bd. of Elections*, 635

F.3d 219, 234 (6th Cir. 2011) (quoting *Bush v. Gore*, 531 U.S. 98, 105 (2000)).

93.    Registered voters have a constitutionally protected right under the

Equal Protection Clause of the Fourteenth Amendment to participate in elections

on an equal basis with other registered voters.

94.    As set forth above, enforcing O.C.G.A. § 21-2-386(a)(F), the

requirement that ballots be received prior to the close of polls, while providing no

remedy for the government's own violation of O.C.G.A. § 21-2-384 that ballots be

sent "as soon as possible" and thus sufficiently far in advance, results in arbitrary

and disparate treatment of absentee voters in counties who began sending runoff

absentee ballots a week or more after it was possible to do so, thus giving such

voters less time to return their ballots than voters in other counties.

95.    In some cases, voters have received so little time that voting absentee

is *de facto* impossible, despite that Georgia provides for "no excuse" absentee

voting.

96.    Depriving individuals of their fundamental right to vote is

undoubtedly a severe burden.

97. Such arbitrary and disparate treatment of the right to vote is inconsistent with the Fourteenth Amendment's guarantee of equal protection.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff DPG requests the following relief:

A. An order and judgment declaring that all absentee mail-in ballots received by Georgia county election superintendents or registrars that are postmarked by December 4, 2018, and that are received within the three-day period following the Runoff Election, if proper in all other respects, shall be valid ballots and shall be counted and included in the certified election results;

B. An order and judgment enjoining Defendant Crittenden from certifying the statewide Runoff Election results until she has confirmed that each county's returns include the counts for absentee ballots postmarked by December 4, 2018, received within the three-day period following the Runoff Election, and proper in all other respects;

C. An order and judgment awarding Plaintiff it's reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

D. Such other and further relief as this Court may deem just and proper.

Dated:  November 29, 2018      Respectfully submitted,

                               **KREVOLIN & HORST, LLC**

                               */s/ Halsey G. Knapp, Jr.*
                               Halsey G. Knapp, Jr.
                               Georgia Bar No. 425320
                               Adam M. Sparks
                               Georgia Bar No. 341578
                               *Attorneys for Plaintiff Democratic*
                               *Party of Georgia, Inc.*

One Atlantic Center, Suite 3250
1201 W. Peachtree Street., N.W.
Atlanta, Ga 30309
(404) 888-9700
(404) 888-9577
hknapp@khlawfirm.com
sparks@khlawfirm.com